Submitted on briefs October 1, 1929; affirmed March 4, 1930

# HATTREM-NELSON & CO., Inc., v. SALMON RIVER-GRANDE RONDE HIGHWAY IMPROVEMENT DIST. et al.

(285 P. 231)

T. B. *Handley* and F. S. *Sever,* both of Portland, for appellant.

*Eugene E. Marsh* and *Vinton & Tooze,* all of Mc-Minnville, for respondents.

McBRIDE, J. ■ We are of the opinion that the writings set forth in defendants' answer should be construed together as a single contract. While the stipulations are contained in separate papers, they were entered into on the same day, dated the same day, all relate to the same transaction, and evidently must have been coincidently in the minds of the parties as factors entering into the bargain. That this is so, appears on the very threshold, by reference to the first paper of the three, contained in defendants' answer, which

recites "in *connection* with your proposed issue" et cetera. The "connection" was so apparent to the mind of the proposer that naturally it crops out in the language used by plaintiff.

■ Instruments executed between the same parties, at the same time, and relating to the same subject-matter, should be construed together as constituting legally but a single instrument: *Kruse v. Prindle*, 8 Or. 158; *Temple v. Harrington*, 90 Or. 295 (176 P. 430) ; *Kinney v. Schlussel*, 116 Or. 376 (239 P. 818), and many other decisions.

We are disposed to treat the various instruments mentioned in the stipulation as constituting a single agreement or transaction to the same extent as if they had all been written out engrossed and executed in a single document. Taking this view, we deduce from all the correspondence, the agreement that defendants were to sell the plaintiff the bonds in question, which were to bear $5\frac{1}{2}$ per cent interest, at par, and that plaintiff was to employ, on behalf of defendants, plaintiff's own attorneys to prepare all legal proceedings, ordinances, resolutions, et cetera, necessary to show authority to issue the bonds; to prepare blank bonds ready for execution and for such service to receive 10 per cent of the amount of the bonds issued. In other words, the district for services, mentioned in plaintiff's proposal, would be obligated to pay plaintiff the sum of $15,000 so that upon the net sum in dollars and cents actually received by it, it would be paying 6-7/10 per cent interest instead of $5\frac{1}{2}$ per cent.

■ When a lawyer or a court compares the amount of the issue with the services to be rendered, it is at once suggested to any fair mind, that either an egregious fraud is being perpetrated on the taxpayers of the dis-

trict, or that the real intent was to sell the bonds actually below par so that in fact the rate of interest to be paid on the money actually received would exceed the 6 per cent limitation prescribed by law. This is not an agreement to pay a reasonable sum to attorneys for performing the required services or even a fixed sum, or a contract to pay the reasonable charges, comparatively speaking, for printing the bonds. It is a contract to ''farm out'' to the purchaser the right to employ attorneys to supervise and exercise the proceedings and engravers to prepare the bonds for a fixed sum to the purchaser of $15,000, leaving it free to get the work done for perhaps a tithe of that sum and pocket the difference. Irrespective of the question of increased interest on the money actually going into the hands of the district, the writer is of the opinion that such a contract ought to be held void as against public policy under the circumstances. But, waiving this view of the case, we are of the opinion that the agreement was in violation of section 23, chapter 399, General Laws of Oregon for the year 1921, which, so far as it relates to the subject under discussion, is as follows:

''Section 23. For the purpose of carrying into effect all or any of the powers hereby granted, such corporation shall have the power to borrow money and to sell and dispose of bonds, which bonds shall, however, never exceed in the aggregate 10 per cent of the assessed valuation for state and county purposes of all property within the limits of said corporation which is by law assessable for state and county purposes. Such bonds shall be issued from time to time as the board of trustees of said corporation may determine, and shall be of such denominations and shall run for such term of years and bear such rate of interest as such board of trustees shall determine;

provided, however, that such bonds shall not bear interest exceeding *in any event* the rate of 6 per cent per annum, * * *.''

We have italicised the words ''in any event'' for the reason of their great importance here.

We have in this case an attempt, by a species of legal legerdemain, to issue bonds, which, on the face of them pay interest at the rate of 5½ per cent, and yet so far as the taxpayer is concerned the interest amounts to 6-7/10 per cent, or 7/10 per cent greater than the law permits.

The principal question here is not whether the district may sell its bonds below par but whether it can enter into a contract by which, in effect, it sells its bonds at so much below par that the legal rate of interest on their productive value to the city exceeds 6 per cent.

■ It is generally conceded that where the result of a sale below par does not have the effect of causing the municipality to pay interest on the money actually received from such sale above the maximum rate permitted by law such contract, if made in good faith, is valid. Such, in effect, was our holding in *Kiernan v. City of Portland,* 61 Or. 398 (122 P. 764, 32 Ann. Cas. 255), where the ordinance prescribed for the issuance of 4 per cent bonds, which should be sold to the highest bidder, and which bonds were sold at a discount which made the interest on the bonds actually 4½ per cent. In that case, there was no limitation as to the amount of interest to be paid such as exists in section 23 of the act of 1921, supra. The ordinance provided that the bonds should be sold to the highest bidder which in itself admitted inferentially that the highest bidder might not be one offering par for the bonds, and we held that

under all conditions the prescription that the bonds should draw 4 per cent interest had reference to the form of the bond which was to be put upon the market, rather than a limitation on the price at which it was to be sold.

■ But here we have an express limitation—"in *no event* shall the interest exceed 6 per cent." In the present "event" the interest on the bonds exceeds 6 per cent, and it does not matter by what subterfuge that result is brought about, whether by giving the *purchaser* a commission or by contracting that he shall have what is palpably an enormous compensation for services, the result is the same. It is doing by indirection what the law forbids to be done directly, and the contract is void. We think that the majority of the decisions so hold. Certainly the better reasoned cases are in accordance with the view above announced: *Uhler v. City of Olympia,* 87 Wash. 1 (151 P. 117, 152 P. 998), is a case very similar to the present. In that case the purchaser bought the bonds at par but contracted for an allowance of $4,500, to "cover the cost of preparation of the bonds and legal expenses." The court held the contract void, in a very clear and comprehensive opinion by Justice Chadwick, from which we quote as follows:

"Turning, then, to the statute governing the present issue, we find that the council is required to issue and sell bonds or warrants, in payment for the public utility, 'bearing interest at a rate not exceeding six per centum per annum.' This limitation on the power of the council is just as prohibitive, and if disobeyed would result in the same evil, as if the statute had provided that the bonds should not be sold for less than par. In either case the object of the law is to prevent speculation in municipal securities, and to insure to those who must ultimately pay the bonds, a dollar in

lawful currency for every dollar of obligations issued. Any device to defeat these purposes, when declared by statute, has been invariably frowned upon.''

"In *Hunt v. Fawcett*, 8 Wash. 396, 36 Pac. 318, the court, having under consideration a statute providing that bonds should not be sold at less than par, said:

" 'While the contemplated sale in this case is nominally a sale at par, it is in fact a sale at a discount and therefore, within the inhibition of the statute. To sell bonds at their face value and at the same time pay a large commission to the purchaser is not to sell at par.'

"And by the same reasoning, to issue bonds of the face value of $90,000 and pay to the purchaser the sum of $4,500 out of the general fund, under the pretense of meeting the incidental expenses of the issue, is plainly a device to pay a greater sum for the use of the money loaned than the statute will permit. Where the mode of sale and delivery is fixed by the law confirming authority to issue bonds, public officials are generally required to make negotiations and effect a sale without the intervention of a financial agent or other representative of the corporation to whom, under a contract of employment, compensation is usually made in the form of a commission. Abbott, Public Securities, § 247.

"In the *Appeal of Whelen*, 108 Pa. St. 162, 1 Atl. 88, a commission had been allowed the purchaser. The statute provided that the bonds should be sold at not less than par. The court held the commission to be a discount, saying:

" 'A man cannot negotiate with himself. The contract is an unequivocal, absolute sale of the bonds to the syndicate at a discount of one per cent. below par— that one per cent. is attempted to be concealed under the thin disguise and sham of a commission. The moment the syndicate became purchasers, they ceased to be agents. If they are agents, entitled to commission, the city is entitled to the benefit of whatever they may

sell the bonds for above par. It is difficult to argue a proposition which, to our minds, is so nearly self-evident.' ''

To the same effect see *Spear v. City of Bremerton*, 90 Wash. 507 (156 P. 825). Other decisions might be cited to the same effect, but the foregoing seem so clearly in point that we omit them here as many of them are sufficiently cited in the opinions referred to above. Cases are cited by plaintiff which are claimed to assert a different holding, but in most of them we find the statute and circumstances attending them are so variant from ours that they do not appeal to us. Such is *State v. West Duluth Land Co.*, 75 Minn. 456 (78 N. W. 115), which holds that a contract with a broker (who was not a purchaser) to sell bonds on commission to be taken out of the price received, was not prima facie void. This might well be in the case of commissions to a broker, and certainly would be the case, if he happened to sell the bonds at large advance above par. The case of *Miller v. Park City et al.*, 126 Tenn. 427 (150 S. W. 90, 30 Ann. Cas. 83), at first blush appears to be fairly in point, but upon further examination may be distinguished from the case at bar. A bank in Connecticut, which was not served, had made a contract for the purchase from the town of Park City of an issue of bonds of that municipality. The offer submitted by the purchasing bank to the committee of the council contained the following propositions, which were accepted by the committee:

"We offer to pay you par value of $25,000 and accrued interest to date of delivery. It is understood, however, that, if we are successful bidders, we will be made an allowance of $1,000 for attorney's fees and other expenses incident to the negotiations."

The additional expenses for printing and lithographing the bonds amounted to $169.32, making a total of $1,169.32 which was taken out of the $25,000 on consummation of the sale.

Miller brought suit to restrain the delivery of the bonds, or to require the bank and councilmen to repay the amount allowed the bank. Before service, the bonds had been delivered and the bank, being a non-resident, was not served and by other proceedings the case finally dwindled down to a suit against the three members of the committee who negotiated the transaction to compel them personally to refund the money so allowed to the bank. The court, in denying the plaintiff relief, said:

"That these defendants acted in entire good faith in negotiating the sale in question, there can be no doubt upon the record. They have so testified, and there is nothing to the contrary. In addition, they made report to the city council of their doings in the premises, which that body fully approved.

"Without saying whether the approval by the city council of the sale of the bonds, with full knowledge of all the facts, would acquit the last-named defendants of all liability now claimed against them, it is quite clear that the recovery sought arises out of an alleged breach of duty which they owed to the municipality, and not the public at large. The right of action, if any, would lie in favor of the municipal corporation. It has never declined to bring suit upon such alleged liability, and the complainants have not requested it so to do. In this connection, it should be borne in mind that the complainants' bill, as against these particular defendants, does not seek to restrain threatened' wrongful action, but seeks to recover for the benefit of complainants and all other taxpayers of Park City for an alleged breach of duty. The learned chancellor held they were in no attitude to do this, and in this there was no error."

As a matter of dictum the court proceeded to say that the contract was entirely lawful; that it could not be said that the city had bonds for sale until they were formulated so as to conform to the provisions of the enabling act, and printed in accordance with the demands of the market, and that a like reason would include reasonable attorney's fees. The court also stressed the fact that the city council had passed an ordinance to its second reading and but for the injunction would have passed it finally, the effect of which would have been to transfer from the city funds to the bond fund a sufficient sum to cover the expenses of the bond sale.

The case was a hard one and the judicial mantle was evidently stretched, and perhaps justly, to cover the act of a committee, which had acted in good faith and where the final result would harm no one. Such a case is not before us and we would hesitate to adopt it in its entirety as a precedent. We are in accord with the Washington cases cited.

The judgment of the circuit court is affirmed.